UNITED STATES v. FRED FRANKEL & SONS (No. 5157)[*][1]

United States Court of Customs and Patent Appeals, May 6, 1965

*John W. Douglas*, Assistant Attorney General, *Andrew P. Vance*, Chief, Customs Section, for the United States.

*Siegel, Mandell & Davidson* (*David Serko, Allan H. Kamnitz*, of counsel) for the appellee.

[Oral argument February 1, 1965 by Mr. Vance and Mr. Serko]

Before WORLEY, Chief Judge, and RICH, SMITH, and ALMOND, Jr., Associate Judges

RICH, Judge, delivered the opinion of the court:

This ██ appeal is from the judgment of the United States Customs Court, First Division (Abstract 67981), sustaining the importer's protest to the classification of glass beads, known as "alabaster beads," imported from Japan on strings.

The collector classified the merchandise as unfinished jewelry under paragraph 1527(a)(2) of the Tariff Act of 1930, as modified by T.D. 51802, and the claimed classification found correct below was under paragraph 1503 of said Act, as modified by T.D. 54108, as beads, not specially provided for. The statutes, in relevant part, read:

Par. 1527(a)(2):

Jewelry, commonly or commercially so known, finished or unfinished (including parts thereof):

\* \* \* \* \* \* \*

All other, of whatever material composed, valued above 20 cents per dozen pieces . . . 55% ad val., but not less than 50% of the amount of duty that would have been payable on January 1, 1945, if the article were not dutiable under Par. 1527, Tariff Act of 1930.

Par. 1503:

Spangles and beads, including bugles, not specially provided for _____ 15½% ad val.

\* \* \* \* \* \* \*

*Provided,* That the rate on spangles and beads provided in this paragraph shall be applicable whether such spangles and beads are strung or loose, mounted or unmounted:

\* \* \* \* \* \* \*

---

*C.A.D. 862.
[1] Petition for rehearing denied July 1, 1965.

The importer took the testimony of two witnesses, Jack Frankel, president of the importer, Fred Frankel & Sons, Inc., associated with that corporation and its predecessor partnership for 20 years, and Joseph H. Meyer, president of Joseph H. Meyer Bros., a customer of the importer as to the imported merchandise. Mr. Meyer had been with his firm for 22 years and said he had been familiar with the imports all his life and with their use by his firm in making imitation pearls sold under the brand name "Richelieu." Several exhibits were introduced showing the imports and their subsequent use.

From the evidence a clear picture of the nature and use of the imported strung beads emerges, as well as the reasons for their particular form, all of which is briefly summarized as follows: The so-called alabaster beads are of a milk-white glass formed into beads by spinning gobs of melted glass rod on a wire from which they are stripped, leaving a hole in each bead. The beads are strung in graduated sizes on a strong double strand of rayon cord, each cord having the largest bead in the middle of the strand, the bead sizes tapering evenly to opposite ends. The lengths of strung bead strands imported are listed on the invoices as 15, 16, 17 and 21 inches, the bead diameters ranging from 3 to 9 millimeters. Upon importation there is an excess of cord of about 60 inches in each string and the strings of beads are tied together in bundles of a dozen. In this form they are unsaleable to the retail trade and unsuited for ultimate consumer use. The importer resells the beads to jewelry manufacturers such as the Meyer firm who pearlize the beads, thus converting them into necklaces which are sold to the retail trade.

The pearlizing process is as follows. The imported strung beads are first cleaned. The beads on each strand are then divided into approximate halves by moving the beads, without changing their original order, to the ends of the long cords. This leaves a long center section of cord free which is strung up and kept clean during subsequent pearlizing. The cords are tied on dipping frames in such a way as to permit each half-strand group of beads to be arranged along the cord with substantial spaces between the beads and while so arranged they are dipped into quick-drying cement which fixes the beads in spaced positions which are maintained throughout pearlizing. The strings of beads are then dipped into a plurality of pearlizing baths and dried after each dip with rotation of the frames to distribute the solutions evenly on each bead. After the last dip, the beads are stripped from the sections of cord, to which they were adhered during coating, onto the clean central portions of the cords and the now empty coated sections of cord are cut off. At this point they are artificial pearl beads, strung, graduated, and in their ultimate selling condition, and on the same cords in the same order in which

they were imported. All that remains to produce the final pearl neck-lace sold to the retail trade is to tip the ends of the cords with fittings called hooks by which clasps are attached, the hooks being bent over upon the clasp elements. Attachment of the clasps completes the artificial pearl necklace and there does not seem to be any argument about its being an article commonly and commercially known as "jewelry."

Comparison of the competing statutory classifications, supra, shows that if the imported strings of beads are specially provided for else-where than in paragraph 1503, then that paragraph does not control. Thus the issue is whether the merchandise constitutes unfinished jewelry within the meaning of paragraph 1527(a)(2).

The Government's position is that the imports were dedicated to use in making artificial pearl necklaces at the time of importation and so should be classified as unfinished artificial pearl necklaces, i.e. as jewelry, unfinished, according to the decisions of this court in *Hecht Pearl Co.* v. *United States*, 18 CCPA 171, T.D. 44375, and *United States* v. *Cartier (Inc.)*, 15 Ct. Cust. Appls. 334, T.D. 42493. The Government also claims support for its position in the statutory language and its legislative history.

The appellee, like the court below, seeks to distinguish the *Hecht* case, while to some extent relying on it, and admits this:

The actual test for determining classification as unfinished jewelry is whether or not the imported beads have been so far advanced toward their final form, as articles of jewelry, so as to remove them from the category of beads.

Appellee argues that in the form imported the strung beads must be "commonly or commercially known as jewelry," that as imported they "do not contain the physical attributes of pearls or imitations thereof," that they "are no more than beads on strings," and that they are "mere material for the making of jewelry." It is contended that only after importation are the strung beads converted into unfinished jewelry and then finally into jewelry. Appellee says "as imported, [the beads are] wholly impractical for any commercial use" and that they "must undergo a form of restringing before they can be used to make an article of jewelry." Further,

It is not until a determination is made as to whether a single, double or triple-strand necklace is to be created that the beads may be considered unfinished jewelry.

Appellee admits that the beads are graduated as imported, and this graduation is not disturbed; however, this fact is not at all determinative of the classification as unfinished jewelry when the merchandise is never used in the imported condition. See, *United States* v. *Wanamaker*, 14 Ct. Cust. Appls. 285, T.D. 41888.

In the *Wanamaker* case our predecessor court sustained the Board of General Appraisers in its ruling that rock crystal beads, graduated, faceted, cut and strung, should be classified as "semiprecious stones,

cut but not set, and suitable for use in the manufacture of jewelry" (par. 1429, Tariff Act of 1922) rather than as "unfinished jewelry," as classified (par. 1428 of said act). The passages of the opinion which show the principal factors motivating the decision are, in our judgment, the following:

The testimony that appellee never uses the importation in the condition imported, that it is always restrung and that the cord is a temporary cord and not a permanent one is undisputed. * * *

* * * * * * *

The strings of beads are sometimes cut up and smaller necklaces, bracelets and earrings are made therefrom, always with a different cord of pure silk, sometimes with rondelles between the beads and sometimes with the graduated arrangement changed.

* * * * * * *

It was not a necklace in its imported condition and to finish it into a necklace would require more than adding to what has already been done. To finish it into a necklace all of the beads, in the order in which they are now strung, might be used, but the present temporary cord would have to be replaced with a different one.

The differences between the facts of the instant case and *Wanamaker* are evident. Here appellee's own witness, Frankel, testified that his firm, as mere importers, in each case sells the imported alabaster bead strings to pearlizing firms such as Joseph Meyer & Company and that the reason for ordering them graduated and in the particular lengths imported was that his customers ordered them that way because they were to be made into necklaces. When made into such necklaces, the beads are still on the same string on which they were imported.

The *Hecht* case, while involving imitation pearls, does not much resemble the instant case on its facts. The imports there were necklaces of imitation pearls, the representative samples being a completely finished necklace, some unfinished necklaces lacking only clasps or needing reworking because in poor condition, and one sample was a four-strand imitation pearl bracelet. The collector, the Customs Court, and this court all agreed the imports were jewelry, finished or unfinished, rather than imitation pearl beads, as claimed by the importer. Half of the imports were sold, presumably at retail to ultimate consumers, exactly as imported. This court agreed with the contention that the imports had been advanced from the state of "material" to finished or unfinished jewelry, agreeing with the Customs Court that, as imported, the wares were all dedicated to use as necklaces or bracelets and that what may have been done with them thereafter was immaterial. The court concluded by saying that much of the reasoning in the earlier *Cartier* opinion seemed to be in point.

In *Cartier*, decided under the Tariff Act of 1922, containing paragraph 1428, which corresponds to paragraph 1527(a)(2) here, the import was a bracelet composed of crystal and platinum links and a

fastener, completed except for the mounting of diamonds in the platinum links. It was classified as unfinished jewelry, the Customs Court sustained the protest, holding it to be material of metal suitable for use in the manufacture of jewelry, under paragraph 1428, and our predecessor court reversed. It said:

The court is of the opinion, however, that the provision for "jewelry * * * unfinished" was designed by Congress * * * to provide that an article so far processed that it was *definitely committed to the manufacture of a particular kind of jewelry*, but not completed, should be subjected to the rate for unfinished jewelry. [Emphasis ours.]

Certainly a part of jewelry, such as that involved in this case, which has been so far advanced as to unmistakably indicate the particular article of jewelry which it will become when completed and which is commercially unfitted in its condition as imported for the making of anything else, is unfinished jewelry.

The court held the unfinished jewelry provision to be more specific than the material of metal provision.

We deem the *Cartier* case to be more nearly in point here than the *Hecht* case and find its reasoning applicable to the facts of this case.

Considering all the facts and weighing the arguments of the parties, we are of the opinion that the imports at bar are unfinished jewelry within the meaning of the paragraph in which the collector classified them. The articles of jewelry which they ultimately become are imitation pearl necklaces. There is no evidence that they ever become anything else. They are not *merely* strings of beads but are the necklaces in an unfinished form. The strings on which the beads are imported are the strings of the final necklaces, the beads are arranged thereon in their final order, never being removed therefrom. The lengths of the strings of beads are substantially within a bead or two, if not always exactly, the lengths of the final necklaces. What is done to complete the manufacturing process is simply the pearlizing of the glass beads and the attachment of clasps to the ends of the portions of the cords preserved in the final product. In making multiple-strand necklaces a bead or two may be removed to obtain the proper drape and spacing of the separate strands but we cannot agree with appellee that the destiny of the imports as specific articles of jewelry—namely, necklaces,—is not determined until the manufacturer decides whether to make them up into single, double, or triple strand necklaces. In every case they become necklaces. We also disagree that the *unfinished* necklaces themselves must be known commonly or commercially as jewelry to come within the provisions of the statute.

We also find unpersuasive appellee's argument that the imports could not possibly be considered unfinished jewelry until they are at least pearlized and stripped to the clean portion of the string. Where the ultimate destiny as necklaces is clear, we do not see that it is of

much importance just which part of the manufacturing process remains to be done so as to make the jewelry "unfinished."

Some reliance has been placed on our decision in *United States* v. *S. H. Kress & Co.*, 46 CCPA 135, C.A.D. 716. We have considered it but do not find it pertinent. The jewelry provision was not involved.

*United States* v. *Emrich & Schorsch*, 13 Ct. Cust. Appls. 199, T.D. 41053, involved strings of amber beads which were always restrung and reassembled and sometimes combined with other beads and roundels. The court found, "There is nothing in the evidence showing that the beads after being restrung are the same in number and arrangement." The factual distinction from the case at bar is clear.

The judgment of the Customs Court is *reversed*.

MARTIN, J., took no part in the decision or consideration of this case.